Argued September 7, affirmed December 19, 1962

STANBERY *v.* SMITH ET AL
377 P. 2d 8

*Allan Hart,* Portland, argued the cause for appellant. On the briefs were Hart, Davidson, Veazie & Hanlon, Portland.

*Cecil H. Quesseth,* Special Assistant Attorney General, Salem, argued the cause for respondent State Board of Education. With him on the brief was Robert Y. Thornton, Attorney General.

*Grant T. Anderson,* Portland, argued the cause for respondent Administrative School District No. 48. With him on the brief were King, Miller, Anderson, Nash & Yerke, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

GOODWIN, J.

Robert C. Stanbery, a taxpayer in School District 104-42 Joint (Sylvan, in Multnomah and Washington Counties) challenged in the circuit court the plan of organization for Administrative School District No. 48 (Washington County) made under the provisions of ORS 330.505 to 330.780. He appeals from a judgment dismissing his petition.

By the enactment of the above-mentioned statutory scheme in 1957, each county of the state was required to constitute a "County Committee for the Reorganization of School Districts."[1] With the help of the county school superintendent, and pursuant to the statutory scheme, the Washington County committee made a

---

[1] ORS 330.510. "(1) In accordance with the provisions of section 3, chapter 619, Oregon Laws 1957, there shall be established in each county a committee to be known as the County Committee for the Reorganization of School Districts. The committee shall consist of nine members who shall hold office * * *.

"* * * * *."

"comprehensive plan for the reorganization of school districts within the county."[2]

One of the factual problems with which the Washington County committee was confronted was the existence of the Sylvan district, which lies athwart the county line and includes taxable property in both Washington and Multnomah counties. The comprehensive plan for the reorganization of Washington County's school districts contemplated a single administrative district, wholly within that county, for grades one through twelve. The new district would exclude all portions of the existing Sylvan grade school district. (It had voted against an earlier plan to unite with the new district.) This exclusion would require a financial adjustment between the new district and the Sylvan district. For several years, taxes from the Sylvan district had gone into Beaverton High School (Union High School Dist. No. 10 Joint). The Beaverton physical plant would, under reorganization, belong exclusively to the new Washington County administrative district. Accordingly, all parties agree, the Sylvan district would have to be paid an equitable amount of cash for its share in the assets of the old high school district.[3]

On or about September 14, 1959, there was prepared and circulated within the County a mimeo-

---

[2] ORS 330.530. "(1) In accordance with ORS 330.523 and 330.-530 to 330.570, the committee shall prepare a comprehensive plan for the reorganization of school districts within the county * * *. "* * * * *."

[3] ORS 330.540. "Subject to the provisions of ORS 328.555, the committee shall determine the value and amount of all school property and all bonded and other indebtedness of all school districts affected by the comprehensive reorganization plan and shall determine an equitable adjustment of all property, assets, debts and liabilities of each such school district."

graphed pamphlet entitled "Proposed School District Reorganization Plan for the Beaverton Area." This pamphlet contained the following:

"SIX: That all assets and liabilities, including all bonded indebtedness, of each of the existing elementary districts included in the proposed administrative school district, and all assets and liabilities, including all bonded indebtedness, of the existing Union High School District 10 Jt., be assumed by the proposed administrative school district. That the new district, after its formation shall pay over to district No. 42 Jt-Sylvan, $150,-680.87, as an equitable adjustment for the value of that district's interest in the assets of the Union High School District 10 Jt."

A public hearing was had on September 14, 1959, presumably pursuant to statute.[④] The minutes thereof do not reveal whether the above-quoted portion of the plan was specifically discussed. The record does show, however, that on September 17, 1959, the Washington

---

[④] ORS 330.550. "(1) Within one year after the date of the county convention, the committee shall complete the preparation of a preliminary comprehensive reorganization plan for the reorganization of school districts within the county. When the committee has prepared its preliminary comprehensive reorganization plan, including maps and charts, the committee shall fix the dates and places for hearings on the preliminary comprehensive reorganization plan. The county superintendent shall give notice of the hearings by publication as provided in ORS 330.635.

"(2) At the hearing the committee shall explain the preliminary comprehensive reorganization plan, with the advantages and any disadvantages resulting therefrom. The committee shall show the cost of the current and the proposed programs of education as nearly as may be estimated. A statement of the adjustment proposed in the preliminary comprehensive reorganization plan for property, assets, debts and other liabilities shall be made at the hearing. At the hearing, any resident of the county or any affected district in an adjacent county may be heard with reference to the changes proposed by the preliminary comprehensive reorganization plan."

County committee had another meeting[6] and revised its comprehensive plan so as to reduce the amount to be paid the Sylvan district from $150,680.87 to $61,757.94. The county committee decided that all unearned interest on the bonded indebtedness of the Union High School district must be included as a liability of the High School district in the calculations of the net assets to be distributed to Sylvan upon reorganization. When the unearned interest upon existing bonds was added to the liabilities of the High School district and the result again calculated by the formula which was being followed in such cases, the net assets of the high school district were inevitably reduced. The amount to be paid the Sylvan district was thus reduced from $150,680.87 to $61,757.94.

All parties accept the figures as accurate and accept the formula employed in arriving at them, except that Stanbery challenges the propriety of including the unearned interest as a liability. He contends that only the debt should be counted, and that interest to become due in the future should be treated as future operating expense rather than as a capital debt item.

Stanbery apparently learned of the change in the amount to be paid his (Sylvan) district a day or two

[6] ORS 330.555. "(1) After the public hearing held as required by ORS 330.550, the committee shall consider any suggestions made at the hearing and shall make such revisions or modifications in the preliminary comprehensive reorganization plan as it considers necessary and shall fix the dates and places for hearings on the revised or modified plan, give notice of the hearings by publication as provided in ORS 330.635 and hold such hearings and thereafter shall adopt its final comprehensive reorganization plan. Subject to subsection (2) of this section, within 10 days after adoption of the final comprehensive reorganization plan but not later than 18 months after the date of the county convention, the committee shall submit at least two copies of its final comprehensive reorganization plan to the State Board of Education.

"* * * * *."

before the next scheduled step in the statutory re-
organization plan. This was the hearing before the
State Board of Education.[⊚] In any event, Stanbery
had not attended the September 17 meeting of the
county committee, and had only secondary information
about it. Stanbery does not contend that there was
anything irregular about the notice, or the manner
in which any meeting or hearing was convened, but
does contend that he was not guilty of any lack of
diligence in attempting to follow the reorganization
proceedings.

At the hearing called pursuant to ORS 330.560,
the State Board of Education was represented by two
of its members together with a Mr. Patch, the staff
executive concerned with various reorganization plans
throughout the state. Stanbery was among the more
than 300 persons who attended this meeting. The
minutes of the meeting contain, among many other
unrelated exchanges, the following:

> "Robert C. Stanbery, Sylvan: * * * I have
> several questions to be answered. The first one is
> concerning the proposed monies to be received by
> the Sylvan District from the Union High School
> District * * * and how did the value shrink from
> $150,650.87 [sic] which was in the original Septem-
> ber 14 plan to today's $61,757.94 * * *."

---

[⊚] ORS 330.560. "The State Board of Education shall receive
and examine the plans for the reorganization of school districts
submitted to it by the committees. Within 30 days after receipt
of a final comprehensive reorganization plan, the State Board of
Education or an authorized representative of the board shall hold
a public hearing at which residents of the county or of any school
district affected in an adjacent county or any other interested
person shall be afforded an opportunity to appear before the
board or its representative and be heard with reference to the
final comprehensive reorganization plan. The secretary to the
State Board of Education shall give notice of the hearing by
publication as provided in ORS 330.635."

"Mr. Patch: * * * You ask further regarding the change in the amount of money that was to be allocated to the Sylvan district as a result of the adjustment made by any reorganization and I would ask Mr. Gray [member of Washington County committee] to give an explanation of that:

"Mr. Gray: That came about with an original error through the county. Certain bonded indebtedness was included which should not have been. Do you wish to amplify that Mr. Scrafford [county school superintendent]?

"Mr. Scrafford: When I first asked for figures on Beaverton High School from the County Treasurer I received only part of what I needed."

The dialogue then passed on to other subjects, and nothing further was said at that meeting or at any other time, so far as the record reveals, concerning the shrinkage of Sylvan's equity in the Beaverton assets. Stanbery understandably says now that he was not satisfied with the answers he received from Messrs. Gray and Scrafford, but he did not say so at the meeting. Indeed, he took no further steps to challenge the reorganization until his petition was filed in court after the reorganization had been accomplished.

The trial court was of the opinion that Stanbery had accepted the quoted explanation and had dropped the matter. The court then held that since Stanbery had not pursued the matter before the State Board, he could not obtain the judicial review which he sought upon the equities of the financial arrangements.

In this appeal Stanbery urges: (1) the statute which provides for school district reorganization specifically requires a trial *de novo* upon the equity of the financial arrangements upon any appeal to the circuit court; and (2), on the merits, the financial

arrangements made in the reorganization plan were not equitable.

Obviously, this court will not reach the merits of the financial arrangements unless it first determines that the trial court was bound to review the reorganization plan upon the record before it. The record contains everything that was said by Stanbery in pursuit of whatever rights he had at the committee and board hearings. The record also reports what was said by the various public officials charged with statutory duties in the challenged reorganization. If, upon this record, judicial review is available, then, but only then, would we address ourselves to the merits of the reorganization plan.

■ We begin with the statute itself.⑦ On its face it appears to require the judicial branch of government to examine into the equities of something done by the legislative branch. There is no doubt that the actions of the statutory committees engaged in school district reorganization are legislative in character. *School*

---

⑦ ORS 330.620. "* * * * *.

"(2) Any person feeling aggrieved by the decision of the State Board of Education, after the hearing provided for in ORS 330.560, may appeal from such decision to the circuit court for that county on any question of adjustment of property, assets, debts and liabilities among the districts involved. Notice of the appeal shall be given to the chairman or secretary of the committee 10 days before the appeal is filed with the court. The court has jurisdiction to determine the constitutionality and equity of the adjustment or adjustments proposed and to direct the committee to alter such adjustment or adjustments found by the court to be inequitable or violative of any provision of the Constitution of Oregon or of the United States.

"(3) Any determination by the court with respect to the adjustment of property, assets, debts and liabilities among the districts or areas involved shall not otherwise affect the validity of the reorganization or creation of any district or districts under the provisions of ORS 330.505 to 330.780.

"* * * * *."

*Dist. No. 9 v. Maxwell et ux.,* 189 Or 317, 325, 219 P2d 155, 220 P2d 95 (1950); *Vestal et al. v. Pickering et al.,* 125 Or 553, 558, 559, 267 P 821 (1928). There is likewise no doubt that the Legislative Assembly has delegated a substantial measure of legislative power to the committees described in the statute. *Padberg; West et al v. Martin et al,* 225 Or 135, 357 P2d 255 (1960). In the absence of some safeguard, the legislature might have believed that the power so delegated could be employed in a manner not contemplated by the legislature.

We need not decide in this case whether the courts must, in every case, review the work of the administrative bodies designated by statute to act in reorganization matters. We shall assume, without deciding, that the constitutional separation of powers does not foreclose judicial review merely because the matter to be reviewed originated in a legislative proceeding.[8] Since we believe the matters complained of in this case are not reviewable for another reason, there is no need to consider the constitutional question.

■ The controlling question is whether the petitioner, by his failure to make a better record during the administrative proceedings, lost whatever right to judicial review he otherwise might have had. He contends that he made the best record he could. The defendants contend that while this may be true the case is nevertheless a proper one in which to apply the general rule against reviewing questions not presented to the administrative agency. The majority of

---

[8] This court has held that the exercise of a delegated legislative power can be made subject to judicial review in proper cases. See Stehle v. Dept. of Motor Vehicles, 229 Or 543, 368 P2d 386 (1962), where we held that the circuit courts could be required to try *de novo* the propriety of an administrative order denying a person a license to operate a motor vehicle.

state and federal courts hold that orderly procedure and good administration require that in order to raise issues reviewable by the courts objections to the proceedings of an administrative agency must be made while the agency has an opportunity for correction. *United States v. Tucker Truck Lines,* 344 US 33, 37, 73 S Ct 67, 97 L Ed 54 (1952). See cases collected in 73 CJS 520, Public Administrative Bodies and Procedure, § 177.

The reason for the general rule is obvious. There is no point in providing for administrative hearings if those to be affected by administrative action do not avail themselves of the hearings in order to present to the administrative body for decision those issues they deem important. Otherwise, judicial review would cease to be review and would become judicial administrative action, or judicial legislation.

The petitioner concedes the vitality of the general rule, but says that he is not raising the issue for the first time in court. The question thus is whether, indeed, he did everything he could or should have done to raise his point at the meeting on October 26, 1959, called by the state board pursuant to ORS 330.560. The meeting was not a hearing in the usual sense, in which diverse points of view could be presented and argued in an adversary context. Nothing was done there to present a conscious choice between alternatives. Rather, the meeting was a general assembly of some 300 or more persons, some twenty-seven of whom made statements. On the merits of the distribution of assets, no criticism was offered and no alternatives were presented. No specific issue on the monetary division between districts can be identified in any way. So far as the record shows, the state board heard no

evidence, nor even an opinion, directed to the issue now pressed by the petitioner.

The record does show that the Washington County committee at its September 17 meeting deliberately and advisedly made the decision to reduce Sylvan's payment from $150,680.87 to $61,757.94. This decision was not, however, appealed to the state board. (In the trial court, the defendants virtually conceded that the decision was not, however, the subject of any public hearing prior to October 26, 1959, at which Stanbery could be charged with a failure to pursue his objection.)

With the record in this condition, it appears that the first opportunity for Stanbery to object to the reorganization plan was the October 26 meeting called by the State Board of Education. This was also probably his last opportunity to object in any meaningful way, i.e., while the board could still do something about it. While we do not decide as much, his opportunity to object may have survived for a short time thereafter. The statutory scheme for reorganization is so loosely drawn from a procedural point of view that we leave open the question whether one who is dissatisfied with the administrative treatment of a particular matter might pursue his point by correspondence, e.g., by a written request for a hearing. However that may be, Stanbery took no further action, and on November 4, 1959, the state board approved the Washington County plan. The state board considered the Washington County plan at a meeting in which a number of other similar plans were also approved. Some members, if not all, of the state board were unaware that the sum to be paid the Sylvan district had been set by the county committee at a substantially higher figure during the preliminary

planning stage. It is clear that the state board did not pass upon the amount of the payment as a separate question. It is equally clear that the board was never asked to do so.

The voters of the proposed district approved the plan on December 21, 1959, and on February 9, 1960, the petitioner gave appropriate notice of his intention to seek review in the circuit court, pursuant to ORS 330.620.

The trial court said, in disposing of the petition, "It would be unfair, and in my opinion, it would be bad public policy for a decision of the board to be reversed upon an issue which was never at any time submitted to the board for decision or brought to its attention." We believe the ruling was consistent with the general law on judicial review and with our former opinions. It will be recalled that in *Stehle v. Dept. of Motor Vehicles,* supra note 8, we observed that the legislature may impose upon courts the duty to review an administrative decision where a case or controversy is presented. In the case at bar, no true case or controversy was ever presented to the State Board of Education. We do not believe that judicial review, even under the liberal provisions of ORS 330.620, requires a judicial examination of the wisdom or the equity of a reorganization plan arrived at by a duly constituted legislative body when no protest was made during the deliberations of that body.

Even though Stanbery may have attempted to make his point before the state board at its public hearing, the record shows that he failed to bring the matter to the attention of that body in a manner that would require it to make a decision. The judicial review provisions of ORS 330.620 cannot be read in a

vacuum. Review must be a review of a decision actually made, not a review of legislative wisdom at large. A body exercising a delegated legislative power must be called upon to make a conscious choice between alternatives if its decision is to be re-examined in court.

Accordingly, we do not decide whether bond interest must be included or excluded in calculating total liabilities under the provisions of ORS 330.540.

Affirmed.