Argued January 23, affirmed June 1, reconsideration denied July 14,
petition for review allowed August 3, 1976
See 277 Or 447, 561 P2d 154

MARBET et al, *Petitioners and Cross-Respondents,*
*v.*
PORTLAND GENERAL ELECTRIC COMPANY,
*Respondent and Cross-Petitioner,*
and
NUCLEAR AND THERMAL ENERGY COUNCIL OF
OREGON, nka ENERGY FACILITY SITING
COUNCIL OF OREGON, *Respondent.*
(CA 4727)
550 P2d 465

[ 470-a ]

*William L. Hallmark* and *Frank Josselson,* Port land, argued the cause for petitioners and cross-respondents. With them on the briefs were Robert L. Allen, Albert J. Bannon, Daryll E. Klein, Ryan Lawrence, William M. McAllister, and Christopher P. Thomas, Portland.

*David N. Hobson,* Portland, argued the cause for respondent and cross-petitioner. With him on the briefs were Phillips, Coughlin, Buell, Stoloff & Black, Portland.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Richard M. Sandvik, Assistant Attorney General, Salem.

Before Foley, Presiding Judge, and Fort and Howell, Judges.

FOLEY, P. J.

**FOLEY, P. J.**

■ This is a petition for judicial review pursuant to ORS 453.375(3) of an order by respondent Nuclear and Thermal Energy Council of Oregon[1] (NTEC), issued on April 11, 1975, recommending to the Governor of Oregon the approval of respondent Portland General Electric Company's (PGE) site certificate application subject to the terms, warranties and conditions of the site certificate agreement for construction of two 1,260 megawatt nuclear power plants near Arlington, Oregon.[2] Petitioners Marbet and Christiansen seek to have the order reversed and the matter remanded to NTEC's successor for further proceedings.

This is the first contested site certificate application proceeding before NTEC. By way of introduction we quote the statute setting forth generally the Council's responsibility to the people of this state, ORS 453.315:

> "In the interests of the public health and the welfare of the people of this state, it is the declared public policy of this state that the beneficial development of peaceful uses of nuclear and thermal energy and the disposition of the wastes therefrom shall be accomplished in a manner consistent with protection to the public health and safety and in compliance with the air, water and other environmental protection policies of this state. * * *"
> (This language was amended by Oregon Laws 1975, ch 606, § 22, p 1455, primarily focusing its application upon energy sources in general. However, the substance of the statute was not affected.)

---

[1] Oregon Laws 1975, ch 606, §§ 35a, 35b, p 1462, provides for the replacement of the Nuclear and Thermal Energy Council of Oregon by the Energy Facility Siting Council in July 1975.

[2] During the course of this litigation petitioners and the Council moved this court for an order remanding the case for further proceedings on the basis that there had been a change in ownership of the nuclear plants in question. We deny the motion herewith because the change in ownership is not a sufficient change in circumstances to warrant remand by this court. *See Greater Boston Television Corporation v. F.C.C.,* 463 F2d 268 (DC Cir 1971), *cert denied* 406 US 950 (1972).

Legislative guidance in the carrying out of the Council's basic responsibility was also provided:

(a) NTEC must "[e]stablish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate * * * [the facility]." ORS 453.455(3).

(b) In performing all of its duties, including consideration of site certificate applications, NTEC must "set standards and promulgate rules for safety, construction and operation of thermal plants * * *." ORS 453.515.[3]

(c) NTEC was required to "adopt safety standards promulgated as rules for the operation of all thermal power plants * * *." ORS 453.505(1). Such standards were to include, but were not limited to, emission standards, standards for necessary safety devices and procedures and standards governing the accumulation, storage, disposal and transportation of radioactive wastes. NTEC did adopt a set of

---

[3] "* * * [NTEC] * * * shall take into account the following:

"(1) The health, safety and welfare of the public.

"(2) The effects of waste heat, moisture and operational radioactive discharge or other impact on the environment and associated natural resources and physical processes, including humans, air, water, fish and wildlife.

"(3) Rules and regulations of the federal Atomic Energy Commission and the Environmental Protection Agency, or their successors.

"(4) Land and water use characteristics of any site, including but not limited to the aesthetics of the site and the environment and the impact on present and future use of adjacent areas.

"(5) Present and future industrial, commercial and residential power needs by classes and amount for each class.

"(6) Beneficial use of waste water developed by the thermal power plant.

"(7) The regulations, if any, of cities or counties relating to the installations of thermal power plants or nuclear installations within their respective borders.

"(8) Ability of the affected area to absorb the industrial and population growth resulting from operation of the plant or the installation." ORS 453.515.

[ 472 ]

comprehensive construction and operating rules, OAR 345-26-005 through 345-26-200, effective March 11, 1975.

(d) ORS 453.345(3) required that NTEC in processing site certificate applications obtain comments and recommendations within specified deadlines from a total of 13 state agencies. Testimony was, in fact, secured, subject to cross-examination, from the agencies identified in the statute.

(e) NTEC was required, if it recommended issuance of a site certificate, to secure warranties from the applicant regarding its financial ability, its ability to construct and operate the facility, and the steps the applicant would take to protect the public health and safety. ORS 453.395(4). Breach of any of these warranties is sufficient to justify suspension or revocation of the site certificate. ORS 453.425.

(f) NTEC was required to impose conditions necessary "for the protection of the public health and safety" should it recommend issuance of a site certificate and must bind the applicant to all existing state laws. ORS 453.395(3). Breach of a site certificate condition likewise justifies revocation or suspension of the site certificate. ORS 453.425.

(g) NTEC was empowered by Oregon Laws 1975, ch 606, § 41, p 1466, to review all security programs for nuclear power plants and for the process of transporting shipments of radioactive materials to and from such plants.

(h) In recognition of the undisputed fact that nuclear power development poses substantial risks, NTEC was vested with extraordinary remedies to curtail the operations or, if necessary, force the immediate shutdown of a plant in the event of danger to the public health and safety. *See* ORS 453.545 and 453.555.

The first issue to be discussed is the status of the

intervenors in this proceeding and the scope of their intervention. ORS 453.375(2) provides:

> "The council may, by proper order, permit any person to become a party complainant or defendant by intervention who appears to have an interest in the results of the hearing or who represents a public interest in such results. However, the request for intervention must be made before the final taking of evidence in the hearing."

NTEC adopted procedural rules regarding intervention, Oregon Administrative Rules, ch 345, § 15-020, which in pertinent part provide as follows:

> "(1) Persons whose interest may be affected by the proceeding may petition for leave to intervene as a party. The petition shall set forth the name and address of the petitioner, and his attorney, if any, and specify in reasonable specific detail the petitioner's interest in the proceeding and the manner in which such interest will be affected.
>
> "* * * * *
>
> "(3) The presiding officer at the hearing shall rule on petitions for intervention, and *orders permitting intervention may be conditioned on such terms as the Council or the presiding hearing officer may direct.* Petitions based only upon matters outside the Council's jurisdiction will be denied. Unless otherwise specified, an order permitting intervention shall not alter or enlarge the issues specified in the notice of hearing.
>
> "* * * * *." (Emphasis supplied.)

After reviewing the petitions for intervention, NTEC entered an order limiting the intervenors to the matters raised in their petitions. In the case of intervenor Marbet, the issues raised consisted of the safe storage of radioactive wastes, prospective dangers from military attacks, dangers of radioactive emissions, and "banking" of the site certificate. Intervenor Christiansen was limited to the question of disposal of radioactive wastes.

Petitioners assign as error the limitations imposed on the scope of their intervention. However, at the hearing both petitioners expressly consented to the

limitation on their participation. In addition, the NTEC staff served upon all parties, including petitioners, the proposed findings of fact, order and site certificate and an opportunity was given to the parties to file objections thereto. Petitioners did not avail themselves of the opportunity to object to the proposed findings of fact, order or site certificate.

The imposition of limitations on intervenors to reflect the extent of their interest is a common practice of administrative agencies. 1 Davis, Administrative Law Treatise, § 8.11 (1958), states at 565-66:

> "Although rules of practice of regulatory agencies characteristically leave specific problems for agency discretion, the rules usually recognize that intervention need not be completely granted or completely denied but that limited participation may be permitted. The FTC provides that the Commission may permit intervention 'to such extent and upon such terms as it shall deem proper.' * * *"

■ In the absence of clear legislative mandate to the contrary, an agency may impose reasonable conditions upon admission of an intervenor to participate in the proceeding. *Vinson v. Washington Gas Co.,* 321 US 489, 64 S Ct 731, 88 L Ed 883 (1944); *BPI v. Atomic Energy Commission,* 502 F2d 424 (DC Cir 1974); *Easton Utilities Commission v. Atomic Energy Commission,* 424 F2d 847, 852 (DC Cir 1970); *Telephone Users Association, Inc. v. F.C.C.,* 375 F2d 923 (DC Cir 1967); *Office of Communication of United Church of Christ v. F.C.C.,* 359 F2d 994, 1005-1006 (DC Cir 1966).

■ On cross-petition, PGE challenges that portion of the Council's order permitting the petitioners to intervene at all in this proceeding and seeks to have Marbet's and Christiansen's petition for judicial review dismissed. PGE contends that petitioners did not have standing to intervene or to appeal from the Council's findings of fact, findings of ultimate fact, conclusions of law and order. We conclude that the Council did not abuse its discretion by allowing petitioners to intervene. We have also arrived at the conclusion that the

conditions imposed upon petitioners were reasonable and thus the Council did not abuse its discretion in limiting the scope of intervention of the petitioners to those matters contained in their petitions for intervention.[4]

The next problem is the scope of judicial review in this case. Intervenors contend that since they were not

---

[4]The exact limitations placed upon petitioner by the Council were:

"A. Conditions imposed upon Intervenor Marbet—

"(1) Intervenor Marbet may cross-examine and give testimony only on the following subject matters:

"(a) The long-handling and storage of the high level radioactive wastes generated by the proposed plans;

"(b) Possible dangers to the public health, safety and welfare associated with military attacks on nuclear power plants;

. "(c) The environmental consequences of radioactive emissions from the plant;

"(d) The propriety of 'banking' sites for the construction of nuclear power plants at some indefinite date in the future.

"(2) Intervenor Marbet may only raise matters which are within the scope of the Council's jurisdiction.

"(3) Mr. Marbet's testimony, if any, must be in written form and served on all parties at a prehearing conference the date of which will be contained in a notice served on all parties.

"(4) At such prehearing conference Intervenor Marbet, together with all other parties, shall identify the witnesses he will wish to cross-examine within the limits of his intervention.

"B. Conditions imposed upon Intervenor Christiansen—

"(1) Intervenor Christiansen may cross-examine and give testimony only on the subject of the disposal of radioactive wastes generated at the plants.

"(2) Intervenor Christiansen shall raise only such matters as are within the Council's jurisdiction.

"(3) Mr. Christiansen's testimony, if any, must be in written form and served on all parties at a prehearing conference the date of which will be contained in a notice served on all parties.

"(4) At such prehearing conference Intervenor Christiansen, together with all other parties, shall identify the witnesses he will wish to cross-examine within the limits of his intervention.

"C. Conditions imposed upon both Intervenors—

"Intervenor Marbet and Intervenor Christiansen shall report at the above-mentioned prehearing conference the extent to which they can consolidate their cross-examination and testimony on the issue of the disposal of radioactive wastes."

The limitations imposed upon the intervenors are in accordance with their respective petitions to intervene.

represented by counsel at the hearing, they should not be limited to raising upon this review only those issues which they raised in their petitions to NTEC. NTEC urges that the scope of judicial review must be limited to the issues raised in the petition for judicial review.

■ It is a well-recognized rule of administrative law "that a 'reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not heretofore presented' " to the agency, thereby depriving the agency of an opportunity to consider the matter. *Neeley v. Compensation Department,* 246 Or 522, 524-25, 426 P2d 460 (1967); *Stanbery v. Smith,* 233 Or 24, 32-33, 377 P2d 8 (1962); *see also* 3 Davis, Administrative Law Treatise, § 20.06 (1958); *Easton Utilities Commission v. Atomic Energy Commission, supra,* 424 F2d at 851-52.

■ Intervenors' petition for review and, additionally, their briefs herein raise issues which were not brought to the attention of the Council by the petitioners. Rule 4.15 of the Rules of Procedure of the Supreme Court and Court of Appeals (1974) provides that:

> "The petitioner shall be restricted on judicial review to points specified in the petition and shall not urge additional grounds."

However, because of the importance of the subject matter of this particular case; we will discuss the principal issues raised, including those raised for the first time in petitioners' briefs.

■ Petitioners contend that NTEC failed to adequately establish standards and rules as required by ORS 453.455. That statute provides:

> "The Nuclear and Thermal Energy Council shall:
> "* * * * *
> "(3) Establish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the thermal power plant or nuclear installation to which the site certificate applies and prescribe the form.
> "* * * * *."

[ 477 ]

Petitioners contend that *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973), requires the formulation of more precise standards than those adopted by NTEC.[5] In *Sun Ray* we required the Oregon Liquor Control Commission to

"* * * formulate and publish the broad bases upon which decisions regarding issuance of * * * [a license] will be made." 16 Or App at 74.

An examination of the rules adopted by NTEC indicates that they are designed to elicit relevant material information from an applicant on the eight factors listed in ORS 453.515 and the two factors in ORS 453.455(3). In summary, they establish:

(a) What the applicant must provide in order to justify its application.

(b) What NTEC, its staff and adverse parties must look for in evaluating the information supplied.

(c) What is at issue as to each specific factor.

(d) Guidelines for a hearing examiner in making rulings on relevancy and the materiality of evidence.

(e) An opportunity for NTEC's staff and any parties to the proceeding to challenge or rebut the applicant's evidence.

(f) Adequate rules to allow a reviewing court to judge whether or not the evidence meets the substantial evidence test.

For example, on the subject of the need for power, OAR 345-25-011 requires the applicant to "[d]iscuss the specific power needs which the plant would meet * * * at the scheduled in-service date of the project." Detailed information, including a discussion of consequences of delaying the proposed plant and the alternatives thereto, is required. Parties can review the information supplied, challenging its methodology,

---

[5]These standards governing site certificate applications are found in OAR 345-25-001 through 345-25-049, effective October 15, 1972.

accuracy and sufficiency. A record is thereby developed allowing NTEC to make a considered judgment on whether the project is needed.

With respect to financial ability, the Rule, OAR 345-25-047, requires the applicant to provide information

"* * * sufficient to demonstrate the financial qualifications of the applicant to construct and operate the plant. Such information shall show that the applicant possesses or has reasonable assurance of obtaining the funds necessary to cover estimated construction costs, operating costs for the design lifetime of the plant, including related fuel cycle costs, and the estimated costs of permanently shutting the facility down and maintaining it in a safe condition.

"* * * * *."

We conclude that this standard is adequate. The applicant must provide information which satisfies the Rule. All other parties have the opportunity, knowing the standard, to attack the information supplied, allowing NTEC to make a judgment on the record.

■ Next we turn to the intervenors' objection to the site certification agreement recommended by NTEC because it does not prescribe the method to be used in transporting, disposing and reprocessing radioactive wastes produced by the plant, does not prescribe a specific plan for decommissioning Pebble Springs reservoir and does not prescribe a specific plan for the emergency dewatering of the reservoir. The site certificate agreement does provide that, prior to the commencement of the reservoir filling, a written report shall be submitted to it describing plans and procedures developed for dewatering the reservoir to insure that persons or property would not be endangered as a consequence of dewatering. NTEC reserved the right to approve these plans when developed. No authority has been cited for the proposition that such a deferral is per se unlawful and we have found no case so holding. The record reflects that NTEC determined that

[ 479 ]

those issues deferred pose negligible risks to the public health and safety and that whatever risk exists is guarded against adequately by the conditions imposed in the site certificate. The court will not presume that NTEC will not exercise its continuing jurisdiction properly.

We conclude that deferring approval on these matters would be unlawful only if they were not considered by NTEC or if the decision to defer casts doubt on the validity of NTEC's ultimate finding that:

"* * * * *

"If constructed and operated in a manner consistent with the Site Certificate Agreement

"(a) The thermal power plants and associated supporting facilities present negligible danger to the public health, safety and welfare;

"(b) The * * * [project] will cause no undue impact upon the environment * * * from waste heat, moisture or operational radioactive discharge.

"* * * * *."

Each of the matters deferred were considered by NTEC and we find there is substantial evidence in the record to support its finding that the authorization of this project, despite the inability to totally resolve the deferred matters, would present negligible risks to the public.

Intervenors assert that all of NTEC's findings are "conclusionary" or "summaries of the evidence," which we held to be inadequate in *Graham v. OLCC,* 20 Or App 97, 530 P2d 858 (1975). NTEC reviewed 900 pages of transcript and hundreds of pages of exhibits in the Pebble Springs proceeding. As a result of its deliberations, it produced a 28-page order containing findings of fact, findings of ultimate fact, and conclusions of law. Accompanying the order was a recommended site certificate agreement containing numerous conditions NTEC considered necessary to protect the public health, safety and welfare. In *Home Plate, Inc. v.*

*OLCC,* 20 Or App 188, 530 P2d 862 (1975), we commented on our holding in *Graham:*

> "If there is to be any meaningful judicial scrutiny of the activities of any administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes. * * *" 20 Or App at 190.

In considering the intervenors' argument we review the findings in conjunction with the site certificate agreement NTEC recommended. NTEC had a dual responsibility. It had to determine whether a site certificate should be recommended and, if so, it was obliged to condition the site certificate on such terms as were necessary to protect the public health, safety and welfare. ORS 453.395(3) provides:

> "The site certificate shall contain conditions for the protection of the public health and safety and shall require both parties to abide by state law and rules of the council in effect on the date the site certificate is executed except that upon a clear showing that there is danger to the public health and safety that requires stricter laws or rules, the state may, subject to ORS 453.505, require complicance with such stricter laws or rules."

NTEC's findings, read in conjunction with the site certificate, indicate what evidence the Council relied upon in reaching its conclusion. These findings do not compel this court to make the inferences frowned upon in *Graham* and *Home Plate, Inc.* to any significant extent.

NTEC's order is based upon the need to make ultimate findings on the eight factors listed in ORS 453.515. The findings of fact themselves are organized with those eight factors in mind. Thus, NTEC's findings are intended to reveal exactly the basic facts

drawn from the records underlying its ultimate findings. NTEC recited only that evidence and testimony upon which it relied. The court here is not required to speculate as to the basis of the decision as we were in *Graham.*

An example, using an issue within the scope of intervention, is helpful. On the subject of the disposal of radioactive wastes, NTEC recognized the concerns raised by the intervenors, particularly with reference to existing uncertainty surrounding the problem. NTEC also cited its staff's view of the problem:

> "* * * [T]he risks to the public associated with waste disposal are very low and are acceptable. * * *"

The findings state that:

> "* * * Further, there are a variety of courses of action presently being considered to resolve the technical problems associated with radioactive waste disposal, and there is reasonable assurance that the technical problems will be solved. * * *"

The portions of the record supporting this conclusion are recited. Noting the uncertainties, the findings state that conditioning operation upon a showing of proper arrangements for the transportation and disposal of wastes is appropriate and that PGE agreed to such a condition. NTEC imposed precisely such a condition in the site certificate. Thus the findings and the site certificate, taken together, adequately demonstrate the basis for NTEC's decision on this question.

■ The intervenors complain that there are no findings of fact on PGE's financial and operational ability to carry out the Pebble Springs project. This is partially true. It must be remembered that this issue was raised for the first time in petitioners' briefs on this appeal. However, evidence on these subjects is contained in the record. PGE's testimony on its financial ability was necessarily general in nature. It pointed out that as a regulated utility,

> "* * * [it] fully expects that its revenue requirements for needed generation such as this plant would be recovered through its rate structure."

It described the internal and external financing methods used to acquire capital. PGE stated that all fuel cycle costs, including reprocessing and ultimate storage, were included in the unit cost of production of the plant. The Public Utility Commissioner testified that:

> "* * * As compared to other electric utilities PGE has * * * the financial ability necessary for certification by the Council."

With regard to construction and operating ability, PGE recited its history in power generation projects, noting that it had always assumed principal responsibility for engineering design and the purchase of generating equipment. It described the organizational structure it proposed to employ in constructing and operating the plant. PGE also provided a description of the qualifications of the personnel it would employ to construct and operate the plants and relied upon its experience in designing and constructing the Trojan Nuclear Plant. The above evidence was not challenged by the intervenors or by NTEC's staff. As we said in *Michelet v. Morgan,* 11 Or App 79, 83-84, 501 P2d 984 (1972):

> "Generally, in appeals from administrative hearings where, after determining the proper legal standard, it becomes clear to the reviewing court that the referee has failed to make a specific finding of fact regarding relevant evidence, the proper remedy is to remand and order the referee to make such findings of fact.
>
> "However, in cases where the evidence not included in the findings of fact is uncontroverted, then remand becomes unnecessary and the reviewing court has the power to consider such evidence in its opinion." (Footnotes omitted.)

We think under the *Michelet* doctrine there are sufficient facts in evidence in support of PGE's financial and operational ability.

■ Intervenors contend that "banking" is an illegitimate regulatory technique, both procedurally and substantively, and should not be permitted by this court.

[ 483 ]

"Banking" as used here means simply that if the Pebble Springs Nuclear Plant No. 1 or Nuclear Plant No. 2 is not under active, continuous construction on December 31, 1977, and December 31, 1978, respectively, it is subject to review by NTEC in a "contested case" format. As the "banking" clause of the site certificate agreement makes clear, PGE must essentially submit to a complete review of the Pebble Springs project if it does not start work on the plants as scheduled, although within a shortened time frame. Other state agencies and these intervenors are entitled to participate in the review which culminates in another "contested case" hearing.

We are aware of no authority which renders that approach illegal. The basic question on this issue is whether NTEC's decision to permit "banking" is legally sound. Its enabling legislation gives little guidance. NTEC is required to obtain the applicant's warranted date of completion of the project and did so. It is also required to condition the site certificate to protect the public health and safety. We find the requirement of additional review if the project is not underway within a relatively short time to be an appropriate, reasonable condition intended to effectuate NTEC's statutory responsibilities on a continuing basis.

Mr. Christiansen petitioned NTEC for leave to intervene to address the issue of radioactive waste. His petition was granted on that ground and he accepted that limitation. It is his present contention that the limitation was unlawful and that NTEC in the face of his agreement as to the scope of his intervention erred in not accepting his testimony on alternative energy sources. We have held that Mr. Christiansen was limited as to the scope of his intervention but, in any event, PGE fully complied with the agency's requirement of discussing alternative means of power generation under consideration by setting forth information on all of the listed types of power generation in its application. With reference to alternative energy sources, PGE testified that alternatives to the pro-

[ 484 ]

posed project, ranging from purchasing power to using different types of generating facilities, were either not feasible or less desirable. The Public Utility Commissioner testified that

"* * * wind, geothermal and solar [energy do not] * * * appear to be sufficiently developed to depend upon at this time."

The refusal of Mr. Christiansen's evidence on this point was not error.

■ Intervenors contend that PGE made no showing of the need for power. PGE presented evidence on its load demands and available resources between 1974-75 and 1985-86, based upon critical hydro conditions which demonstrated a need for the project. This evidence was supported by the "West Group forecast" published by the Pacific Northwest Utilities Conference Committee.

The Public Utility Commissioner's testimony supported PGE's need analysis as to the unavailability of alternatives. The Commissioner pointed out that financial constraints would force PGE to defer or drop the project should the need lessen. NTEC's staff independently reviewed the need for power issue and stated that:

"Near term provisions must be made for additional generation. Whether or not industry projections are absolutely correct, there will be a need for several thousand megawatts of additional electrical generating capacity in Oregon between now and the year 2000. The quantity 12,500 MW may be an appropriate order-of-magnitude estimate. * * *"

■ Intervenors attack the findings with reference to the handling of spent fuel. In that connection PGE testified that spent fuel elements would be stored under water for several months to reduce their dangerous propensity. They would thereafter be transported off site in specially designed casks, complying with all federal regulations, to be reprocessed. NTEC's staff addressed the element of risk involved in storage,

[ 485 ]

transportation, reprocessing and ultimate disposal of these wastes. Expert witness Pollock concluded that then-pending reviews by all levels of government justified a conclusion that "clandestine diversion [of spent fuel] will not pose a serious threat to the public health and safety." He pointed out the federal policy regarding treatment of wastes remaining after reprocessing. He described how the wastes will be stored temporarily in fused or sintered form. He also described the possible methods of ultimate storage under consideration. The fact that ultimate resolution of this problem depended upon a choice between several apparently feasible methods was stressed by both Mr. Pollock and PGE's Mr. Grund. Based upon this analysis, Mr. Pollock stated that in his opinion

"* * * the risks associated with waste storage are not completely unreasonable."

Then these questions were asked:

"Q [By Mr. Christiansen:] O.K. The only final question that I have is, that your last statement says 'it appears that the risks associated with waste storage are not completely unreasonable.'

"Does this mean that you do recognize that there are, that there are some reasonable risks about that——"

"A [By Mr. Pollock:] No, I don't think that is the intent that I meant to express in those words. The intention was that I thought the risks and the uncertainties associated with the waste disposal question, and having those in mind, it is reasonable to proceed with nuclear plants."

In addition, Mr. Pollock was asked by Mr. Marbet concerning the problem of disposal of waste:

"Q And you feel that we will be able to handle it, even though there hasn't been a final decision as far as what is going to be the end disposal?

"A Yes."

There was also testimony from PGE experts that the problems of disposing of waste would be solved; that the Trojan Nuclear Plant has contracts for dis-

posal of waste; and that the wastes could be safely disposed of.

■ With reference to dewatering and decommissioning Pebble Springs reservoir, the intervenors contend that the findings are not supported by the facts. "Dewatering" simply means emptying most of the water from the reservoir in a planned manner. On this issue the Council found that:

"The proposed reservoir will provide a closed-cycle cooling source for the thermal power plants, with no discharges to the Columbia River or other natural bodies of water in the normal course of operation. Under very unusual circumstances, such as a need to perform maintenance of the reservoir's dams, the reservoir may need to be dewatered into a flow easement (Ex. S-1, p. 12). Under these circumstances, the maximum rate of flow would be 410 cfs and the water would follow a course down to Eight Mile Creek, then to Willow Creek, and then to Columbia River (Tr. 577). PGE is presently conducting studies regarding the potential impact of this water on civil structures such as bridges and culverts (Tr. 578). There presently is no population in the path of this possible flow (Tr. 579)."

There is no evidence in the record that dewatering would create any danger to the public. However, a condition is included in the site certificate that PGE shall have a procedure to insure that there will be no danger from dewatering prior to commencement of the reservoir filling. Nor is there any evidence in the record indicating that decommissioning the reservoir would present a danger to the public or wildlife. Nevertheless, a further condition is that PGE must present a plan that will prevent any problems.

After the record had been closed and as NTEC was commencing its deliberations, Mr. Marbet asked NTEC to reopen the record to receive additional evidence on liquid radioactive waste discharge, evidence of a recent fire at the Brown's Ferry Nuclear Power Plant, and conflicting evidence regarding an Atomic Energy Commission's study of the effects of postulated

[ 487 ]

accidents at nuclear reactors. This motion was addressed to NTEC's discretion. Thus, absent a demonstration that NTEC abused that discretion or was clearly wrong, the court must reject this ground of review. *Bay v. State Board of Education,* 233 Or 601, 378 P2d 558, 96 ALR2d 529 (1963). The record reflects that the motion was fully argued and considered. The record does not reflect an abuse of discretion or support a conclusion that the ruling was clearly erroneous.

■ ■■ Intervenors claim a right to attorney fees for prosecuting this appeal, relying upon *Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975). Their reliance is misplaced. To date the Oregon Supreme Court has employed the equitable rule on attorney fees only in cases of constitutional significance. *Deras v. Myers, supra; Gilbert v. Hoisting & Port. Engrs.,* 237 Or 130, 384 P2d 136, 390 P2d 320 (1963), *cert denied* 376 US 963 (1964). This case raises no constitutional issues. Here intervenors have exercised an opportunity to participate in an administrative proceeding to present one viewpoint in the spectrum of public attitudes toward nuclear power. Potentially NTEC or other agencies like it which permit intervention in licensing or in environmental decision-making could have numerous intervenors, each representing different facets of the public interest. In such a circumstance, it would be inappropriate under existing law to award attorney fees to participants. The procedure of allowing intervention is intended to encourage rather than prevent citizen participation in government. *Deras v. Myers, supra,* should not be extended to such a situation.

In summary, we conclude that:

(1) NTEC exercised its discretion properly in granting intervention, in limiting the scope of intervention, and in refusing to reopen the hearing for additional evidence;

(2) It adopted standards adequate to provide guidance to itself, the parties, and this court in

analyzing PGE's application and reaching a reasoned decision thereon based upon relevant, material evidence;

(3) It lawfully issued its order despite an absence of detailed plans on certain issues, since it concluded that the lack of detail posed negligible risk to the public health, safety and welfare;

(4) It developed adequate findings and conclusions, consistent with its standards, to justify its order;

(5) It lawfully required PGE to submit the project for further review, in a "contested case" format, if the plants are not under active, continuous construction by specified dates; and

(6) It based its findings upon substantial evidence on all material issues.

NTEC carried out its statutory responsibilities fairly under the circumstances here involved and its order is affirmed in its entirety.

Affirmed.