Argued October 6, 1976, reargued January 6, reversed and remanded
March 3, petition for rehearing denied March 29, 1977

## MARBET, *Petitioner,*

*v.*

## PORTLAND GENERAL ELECTRIC
## COMPANY et al, *Respondents.*

### (CA 4727, SC 24630)

561 P2d 154

[ 448 ]

[ 448-b ]

William L. Hallmark, Portland, argued the cause for petitioner. With him on the briefs were Robert L. Allen, Albert J. Bannon, Daryll E. Klein, Ryan Lawrence, William M. McAllister, Christopher P. Thomas, and Frank Josselson, Portland.

W. Michael Gillette, Solicitor General, Salem, argued the cause for respondent Energy Facility Siting Council. With him on the brief were Lee Johnson, Attorney General, and Richard M. Sandvik, Assistant Attorney General, Salem.

David N. Hobson of Phillips, Coughlin, Buell, Stoloff & Black, Portland, argued the cause for respondent Portland General Electric Company.

Before Denecke, Chief Justice, Holman, Tongue, Bryson, Lent, Linde, and Bradshaw, Justices.

LINDE, J.

Bryson, J., dissenting opinion.

**LINDE, J.**

Since 1971, construction of facilities for the production and transmission of energy has required a site certificate from the state. This case is the first contested proceeding under the energy facility siting act, now ORS 469.300-469.570, 469.992. On application of respondent Portland General Electric Company (PGE), respondent Nuclear and Thermal Energy Council (now renamed Energy Facility Siting Council) recommended to the Governor that he issue a site certificate to PGE for construction of two nuclear-fueled power plants at a site in Gilliam County known as Pebble Springs. Two individual petitioners whom the council had admitted as intervenors in its proceedings obtained review in the Court of Appeals. That court affirmed the council's order, 25 Or App 469, 550 P2d 465 (1976), and petitioner Marbet sought review in this court. We allowed the petition in order to resolve issues of substance and procedure important to the administration of the statute. We reverse and remand to the Court of Appeals with directions to remand to the council for additional proceedings.

*The statutory scheme*

After enactment of the original statute, Oregon Laws 1971, ch 609, no facilities covered by the act could be constructed or expanded without a certificate executed by the Governor upon the recommendation of a Nuclear and Thermal Energy Council composed of the Public Utility Commissioner, the State Engineer, the State Health Officer, the Director of the Department of Environmental Quality, and five "public members" appointed by the Governor. In 1975, in legislation revising the state's energy laws and creating a Department of Energy, the terms and coverage of the facility siting law were amended in some respects, and the Nuclear and Thermal Energy Council was replaced by a new Energy Facility Siting Council composed only of seven public members. Oregon Laws 1975, ch 606.

[ 449 ]

The statute assigns the council a wide range of duties relating to power facilities in this state. Its responsibilities concern the selection and certification of sites, ORS 469.470, the operating safety of power plants, their environmental effects, and disposal of their wastes, ORS 469.500, the security of nuclear installations and the transportation of radioactive material, ORS 469.530. The statute reflects a legislative policy to centralize these responsibilities in the council. The council's site certificate, when signed by the Governor, is binding on all state and local agencies as to the use of the site and the construction and operation of the facility, and other state agencies are directed to issue whatever permits may be required under their respective authority. ORS 469.400(5). The concerns previously pursued through these separate agencies are now to find expression through special advisory groups, ORS 469.480, interagency coordination, ORS 469.470(6), 469.520, and in the council's procedures, ORS 469.350(3), 469.370(1), 469.380, ORS 469.470(2) and (4). These procedures include provisions for public participation, but the nature and extent of that participation is disputed in this case.

The statute expressly directs the council to exercise some of its functions by rules or regulations. ORS 469.500(1), 469.510, 469.530. In the process of site certification, the statute directs the council to proceed by three procedures: General studies and investigations relating to site selection, ORS 469.470(1), designation, after public hearings, of areas suitable or unsuitable as sites for various types of energy facilities, ORS 469.470(2), and action on applications for certification of a specific site, ORS 469.370, 469.470(4). Proceedings on a specific application result either in a rejection of the application or in a recommendation to the Governor to grant the certificate. A certificate must contain conditions for the protection of the public health and safety, ORS 469.400(3), and the applicant's warranties as to this protection and as to its financial and operating qualifications, ORS

[ 450 ]

469.400(4). The Governor may decide against the recommended certificate, but he cannot execute a certificate rejected by the council. ORS 469.400(7). A site certificate is executed by the applicant as well as by the Governor acting "for the state of Oregon" (described in the statute as "parties"), and once executed it is binding on the state, ORS 469.400, although it may be revoked or suspended for cause. ORS 469.440. All the foregoing procedures and judicial review thereof are subject to the Administrative Procedure Act, ORS 183.310-183.500.

A central question concerns the standards to be used by the council in reaching a certification decision. The key section on the site certification process, ORS 469.470, directs the council to establish standards "that applicants . . . must meet" including standards of ability to finance, construct, and operate the facility. The parties are in disagreement whether the council complied with this directive.

### The proceedings

PGE filed its statutory notice of intent to apply for a site certificate in December 1972 and its application in December 1973, followed by amendments in May and July of 1974. The notice of intent and the application were circulated to other agencies for their comments, as required by ORS 469.350(3). In September, 1974, the council published notice of a prehearing conference and a hearing schedule. Thereafter Mr. Lloyd K. Marbet of Portland, Oregon, and Mr. Harold C. Christiansen of Lincoln City, Oregon, filed petitions to intervene in the council's proceedings in opposition to the application. Marbet asked to intervene as an individual and in a representative capacity in order to dispute issues concerning dangers posed by nuclear power plants and radioactive materials to persons, plants, and animals, and concerning the propriety of "banking" a site (i.e., extending the period of a site certificate beyond the date of construction on which the application is premised). Christiansen

petitioned to intervene as an individual on the issue of dangers to health and welfare to himself and others posed by the disposal of nuclear waste materials. Over PGE's objections, the council granted Marbet's and Christiansen's petitions to intervene, limiting each to testify and cross-examine on the issues raised in his petition.

After prehearing conferences to identify contested issues, a hearing examiner held hearings on PGE's application in November, 1974, in Arlington and Portland. Thereafter the parties were invited to submit findings, conclusions, and proposed terms for the site certificate, and to reply to such submissions. On April 11, 1975, the council adopted its order, accompanied by findings and conclusions, recommending to the Governor approval of a site certificate for PGE's Pebble Springs project under the terms, warranties, and conditions of a site certificate agreement accompanying the order. One member of the council dissented on the ground that serious problems of the disposal of spent nuclear fuel remain unresolved.

The intervenors, Marbet and Christiansen, obtained review of the order in the Court of Appeals. In a cross-petition, PGE raised objections to the council's admission of intervenors as parties to the proceedings. While the case was before the Court of Appeals but after the statutory deadline for agency withdrawal of an order for reconsideration, ORS 183.482(6), petitioners and the council asked the court to remand the case for consideration of subsequent changes in the financial arrangements for the project. The Court of Appeals denied this motion and affirmed the council's order in all respects. Only Marbet petitioned for review in this court. However, PGE's contentions in the Court of Appeals remain pertinent to the extent that, if accepted, they would preclude reversal of the judgment affirming the order. Accordingly, we turn first to the preliminary issues of judicial review.

## Status of the parties

■ Since the council's order resulted from a contested case, ORS 183.310(2), judicial review is governed by ORS 183.480. The pertinent words read:

> "(1) Any person adversely affected or aggrieved by any order or any party to an agency proceeding is entitled to judicial review of a final order, . . ."

The statute provides two distinct bases of standing entitling one to judicial review of an agency decision. Any *party* to the agency proceeding, which includes any person in fact named or admitted as such by the agency, ORS 183.310(5), is entitled to judicial review by that fact alone, without further showing of interest. But one need not have participated in any way in the administrative process to obtain judicial review. Any *person* is entitled to judicial review of an agency order if he is either "adversely affected" or "aggrieved" by that order. Respondent PGE contends that petitioner does not meet either of these criteria for standing as a "person;" that he does not have standing as a "party" if he was improperly admitted as an intervenor by the council; and that if he is a "party," the court's scope of review is limited to rulings made against him and objected to in the agency proceedings. Petitioner in turn contends that the council erred in the limits it imposed on intervenors.

Neither the issue of standing under the administrative procedure act nor the issue of intervention under the energy facility siting act depends on generalizations of administrative law. Both issues have been resolved by the legislature.

As to intervention, ORS 469.380 prescribes:

> "(2) The council may, by proper order, permit any person to become a party complainant or defendant by intervention who appears to have an interest in the results of the hearing or who represents a public interest in such results. . . ."

The statute thus gives no greater procedural weight to an intervenor's personal self-interest than to an inter-

est that he shares with other members of the public. It expresses the legislature's judgment that the important decisions of public policy entrusted to the Energy Facility Siting Council are not to be treated as a dispute between opposing private interests.

The text does not support PGE's contention that by "a public interest," the legislature meant only an organized interest group. The difficulties with such a restriction appear in this case. Mr. Marbet in fact stated that he represented an "organization" consisting of himself and one other person, which he calls "Forelaws on Board," and also Coalition for Safe Power, which he described as a group of people who meet to discuss energy questions. Inquiry into how and how far these groups authorized his testimony proved unenlightening. But nothing of legal importance hinges on the widespread practice of presenting viewpoints on public policy under some banner embroidered for the occasion.

Nor does the statute support PGE's contention that the "public interest" is restricted geographically. Communities in immediate proximity to a proposed site have economic and other reasons to desire or to oppose a project that differ from the interests of a wider public, as the hearing in this case shows.[1] Representation of these interests is hardly limited to residency in Gilliam County. To the contrary, the statute calls for consideration of some local factors in setting construction and operating standards, e.g. the uses of "adjacent areas," ORS 469.510(4), some regional consequences, e.g. the ability of affected areas to absorb industrial and population growth, ORS 469.510(8), and some that extend beyond the boundaries of the state, e.g. the public interest in power production, ORS 469.510(5), in environmental effects on air, water, and biological organisms that may enter the food chain, ORS

[1]The Gilliam County Court, Planning Commission, County Commission, and Port of Arlington, the Mayor of Arlington, and all but one local resident testifying at the Arlington hearing strongly supported construction of the power plants at the Pebble Springs site. Findings, VII C.

[ 454 ]

469.510(2), or in possible dangers that transporting toxic materials may pose for the public health or safety, ORS 469.510. The intervention contemplated in ORS 469.380 may rest on any of these geographically more distant interests, yet this does not preclude a party from addressing the more localized factors in the decision which will affect that interest.

What matters under the quoted statute is that the interest the intervenor proposes to represent, if not a merely personal one, be an interest shared by a significant part of the public or one to be considered an element in the over-all public interest. The statute leaves the agency discretion to determine whether an intervenor is qualified to represent such a public interest. It does not assume expertise or organizational backing, but neither does it open a contested case hearing to all comers. Much depends on the nature of the issues and on the presence of other qualified parties representing the same public interest. To avoid redundancy, the agency may choose to require intervenors to join in one presentation or to address separate aspects of the public interest as long as the effect is not to exclude an asserted public interest altogether. Something like this was done in the interventions of Marbet and Christiansen in these proceedings. They accepted the restrictions on their testimony and cross-examination, and we find here no abuse of discretion by imposing conditions over an intervenor's protests.

It does not follow that each intervenor has standing to seek judicial review only of issues arising from his individual intervention. Such a rule could preclude a person who intervenes from securing review of the legality of the final order[2] on issues that the agency in fact decided on someone else's initiative. No rule compels that result. See, e.g., *Hennesey v. SEC,* 285 F2d 511, 515 (3d Cir 1961).

---

[2]The council's recommendation is a "final order" by virtue of ORS 469.370(2) and 469.380(3), independently of the Governor's decision on the certificate.

■■    The requirement that a party must have objected before the agency to errors he asserts on judicial review is one facet of the general doctrine that a party must exhaust his administrative remedies. Professor Davis describes the rule as "not rigid but flexible," 3 Davis, Administrative Law Treatise 92, citing *Hormel v. Helvering,* 312 US 552, 61 S Ct 719, 85 L Ed 1037 (1941). This court has employed it as a policy making for "orderly procedure and good administration," *Stanbery v. Smith,* 233 Or 24, 33, 377 P2d 8, 12 (1962).[3] The requirement applies most obviously to the typical case when the party seeking judicial review is the one whose license or other "individual legal rights, duties, or privileges" are the occasion of the contested case, ORS 183.310, and to procedural or evidentiary rulings that were made or, on the party's motion, could have been made within the contested case proceeding itself. *Cf. Neeley v. Compensation Dept.,* 246 Or 522, 426 P2d 460 (1967). It is less obviously applicable when the agency action is challenged as based on an unconstitutional statute, ORS 183.482(8)(b), or on a rule invalid by the criteria of ORS 183.400(3); for these are legal flaws which the agency could not remedy in the contested case. Indeed, this court has dispensed with the "exhaustion" requirement entirely in one such case. *Sunshine Dairy v. Peterson,* 183 Or 305, 345, 193 P2d 543, 560 (1948). There can be other justifications for considering on judicial review important statutory issues not first decided by the agency, *see Board of Public Instruction of Taylor County, Fla. v. Finch,* 414 F2d 1068, 1072-1073 (5th Cir. 1969), especially when correct administration of the statute concerns public interests beyond those of the parties.

■    An invariable requirement that judicial review must be limited to objections first made to the agency is foreclosed in any event by the present text of ORS

---

[3]Stanbery was one of 300 persons who attended a State Board of Education hearing on a proposed school district reorganization, which the court characterized as "legislative in character". Whether or not the decision should have hinged on the points Stanbery pursued in such a setting, review in that case was not under the APA.

[ 456 ]

183.480, quoted above. Until 1971, this section provided judicial review only for parties to the contested case. The 1971 revision of the APA extended judicial review of agency orders also to persons who have never appeared before the agency and obviously have not raised objections in its proceedings. Oregon Laws 1971, ch 734, § 18. Such an aggrieved person is entitled to the full scope of review stated in ORS 183.482(7). In the context of ORS 183.480(1), quoted above, "aggrieved" means something more than being dissatisfied with the agency's order, yet distinct from being "adversely affected" by it. Whatever may be the reach of "person . . . aggrieved" in different settings, it surely includes one whom the agency itself, pursuant to a statutory directive, has recognized to present an interest that the legislature wished to have considered.[4] It would be incongruous to hold that such a person's standing on judicial review is narrowed by virtue of being admitted as a "party" with respect to some issue rather than as a "participant," ORS 183.450(3), and nothing in ORS 183.480 supports such a result.[5]

---

[4] The comparable phrase in the federal Administrative Procedure Act contains the additional words, italicized here, "adversely affected or aggrieved by agency action *within the meaning of a relevant statute.*" Whether or not the omission of these words in the Oregon APA broadens the range of "aggrieved" persons, in this case the intervenor's interest was one recognized by the relevant statute, ORS 469.310, 469.380. *Compare Hardin v. Kentucky Utilities Co.,* 390 US 1, 88 S Ct 651, 19 L Ed 2d 787 (1968). Apart from statutory differences, federal "standing" decisions are preoccupied with the phrase "cases and controveries" in U.S. Constitution, Art III, § 2, which limits the issues Congress can ask federal courts to adjudicate. *See Association of Data Processing Service Organizations v. Camp,* 397 US 150, 90 S Ct 827, 838, 25 L Ed 2d 184 (1970); *Barlow v. Collins,* 397 US 159, 90 S Ct 832, 25 L Ed 2d 192 (1970); *Flast v. Cohen,* 392 US 83, 88 S Ct 1942, 20 L Ed 2d 947 (1968). It is not contended here that the standing conferred by ORS 183.480 exceeds "the judicial power of the state," Oregon Constitution, Art VII (Am), §1.

[5] Challenge to agency action by persons aggrieved to whom the action was not addressed is nothing unusual. In *Hardin v. Kentucky Utilities Co., supra note 4,* plaintiff utility company was allowed to challenge findings of the Tennessee Valley Authority without discussion whether it had first presented its arguments to the TVA Board, *Kentucky Utilities Co. v. TVA,* 237 FS 502 (ED Tenn 1964). This court has similarly reviewed administrative actions of agencies operating a municipal water and power system,

We turn to the merits.

### The council's duty to "establish standards"

The most important issue is whether the council failed to establish the standards required by ORS 469.470 before it reached its decision to recommend a site certificate for the Pebble Springs project.

Unlike other administrative law decisions discussing the issue, this case does not present the question whether an agency has been empowered to reach individual decisions directly under the terms of its authorizing statute without articulating any intermediate standards.[6] The energy facility siting act expressly directs the council to set its own standards refining the statutory policies. ORS 469.470 provides that the council shall:

> "(3) Establish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the energy facility to which the site certificate applies and prescribe the form."

Similarly, ORS 469.510 mandates that the council, in performing its duties including site certification, shall "set standards and promulgate rules for safety, construction and operation of thermal plants and nuclear

---

*Miles v. City of Eugene,* 252 Or 528, 451 P2d 59 (1969), and a port, *Carruthers v. Port of Astoria,* 249 Or 329, 438 P2d 725 (1968), without questioning whether the party entitled to review had first presented its objections to the agencies.

In *Oregon Newspaper Publishers Assoc. v. Peterson,* 244 Or 116, 415 P2d 21 (1966), plaintiffs were allowed to challenge a regulation of the Board of Pharmacy addressed not to them but to pharmacists. The court was concerned about plaintiffs' standing and the "ripeness" of the issue for judicial review, but nothing in the opinion turns on whether plaintiffs' arguments were first made to the Pharmacy Board. This decision was cited as a prominent source of the 1971 revision of ORS 183.480. See Oregon State Bar, 1970 Annual Committee Reports, Administrative Law, p 23.

[6] *Compare, e.g., Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963) with *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973).

installation[s]," taking into account a list of eight considerations.[7]

■　There is thus no doubt that the council is directed to exercise its own judgment in setting standards beyond the policies stated in the statute itself, though of course consistent with those policies. It is less clear that the statute directs the council invariably to set these standards by rulemaking in advance of a specific site certification proceeding. When compared with another section of the same statute that unambiguously directs the council to "adopt safety standards *promulgated as rules* for the operation of all thermal power plants and nuclear installations . . .," ORS 469.500 (emphasis supplied), the phrase "set standards and promulgate rules" is not free from ambiguity.

■■　However, the directive to the council gains meaning from the functions served by agency-formulated

---

[7] ORS 469.510:

"In performing its duties and exercising its powers under ORS 469.300 to 469.570 and 469.992, the council shall, subject to ORS 469.500, set standards and promulgate rules for safety, construction and operation of thermal plants and nuclear installation which shall take into account the following:

"(1) The health, safety and welfare of the public.

"(2) The effects of chemical, waste heat, moisture and radioactive discharge or other impact on the environment and associated natural resources and physical processes, including humans, air, water, fish and wildlife.

"(3) Rules and regulations of the federal Nuclear Regulatory Commission, the Environmental Protection Agency, the Federal Department of Transportation and the Federal Energy Administration or their successors.

"(4) Land and water use characteristics of any site, including but not limited to the aesthetics of the site and the environment and the impact on present and future use of adjacent areas.

"(5) Present and future industrial, commercial and residential power needs by classes and amount for each class.

"(6) Beneficial use of waste water developed by a thermal power plant.

"(7) The regulations, if any, of cities or counties relating to the installations of thermal power plants or nuclear installations within their respective borders.

"(8) Ability of the affected area to absorb the industrial and population growth resulting from operation of the facility."

standards in the context of ORS 469.470 and of ORS 469.510. The demand of ORS 469.470 for standards "that applicants for site certificates must meet," indicates that these standards will be available to applicants and to persons opposing applications in sufficiently meaningful terms to guide them in deciding whether and how to submit or oppose an application. The planning of energy facilities takes too much effort, time, and expense to be exposed to rejection under a standard which the applicant could not have known even in broad terms and which it might not have undertaken to meet. But there are differences among the factors to be taken into account and their role in establishing the council's standards under ORS 469.470 and 469.510. Some of the factors to be considered in setting standards for safety, construction, and operation, for instance, are expressly stated in terms relative to a particular site, e.g. the characteristics of the site, ORS 469.510(4), the growth-absorbing capacity of the surrounding area, ORS 469.510(8), and the environmental impact of the installation, ORS 469.510(2), which presupposes a particular environment. Thus the council's standards and rules under ORS 469.510 can initially be stated only in general terms and made more concrete only in the course of a proceeding focusing on a particular kind of installation at a particular location. Nevertheless, at some point they must become standards *for* making the council's eventual decision, not merely findings *in* making the decision.

■ If the council chooses in this fashion to move from general over-all standards to more specific ones bearing on the proposed facility and site, it must be able to do so after the initiation of the proceeding. The procedure for adopting a standard to be applied in a few complex, large-scale decisions such as the site certifications entrusted to the council is not necessarily the same as that chosen to state precise rules for numerous or frequently recurring situations. The Oregon Administrative Procedure Act (APA), like most, is

premised on a distinction between two kinds of agency action, rulemaking and the decision of "contested cases." In principle, rulemaking procedure is to be used in stating general agency policy, ORS 183.310(7). "Contested case" procedure is to be used in applying statutory or agency policy to specific parties on particular facts. ORS 183.310(2). When the decision of a concrete case presupposes agency adoption of general standards under which it is to be decided, those standards normally must be adopted by rulemaking procedure before they can be applied in the case. However, the APA also recognizes that a general rule will sometimes be stated in explaining a particular decision by an agency, just as by a court. Thus ORS 183.355(5) provides that "if an agency, in disposing of a contested case, announces in its decision the adoption of a general policy applicable to such case and subsequent cases of like nature the agency may rely upon such decision in disposition of later cases."

The choice of one or the other procedure has important consequences. In adopting a policy or standard as an agency "rule," the agency is not bound to facts or arguments in the record of the rulemaking proceeding. ORS 183.335, 183.400(3). Whether or not a hearing is held, interested persons may present data or views bearing on the proposed policy without having to "prove" either their interest or their assertions; there are no "parties" to rulemaking. ORS 183.335(3), (4). Accordingly, notice of proposed rulemaking is given to the general public. ORS 183.335(1), (2). But the agency may base its policy on other sources of information and opinion than those submitted to it. In a contested case, by contrast, the issues are supposedly framed by preexisting criteria. Arguments are to be presented by parties and testimony by sworn witnesses. ORS 183.415. Only parties are given notice and only they are entitled to be heard and present evidence. *Id.* Contested case procedures are not designed to hear representatives of various viewpoints on issues of public policy unless, as in this case, the agency permits

them to intervene. The agency's order must be based on findings and conclusions, ORS 183.470, which must rest exclusively on evidence that has been offered and made part of the record, or stipulated or officially noticed for the record, ORS 183.450, otherwise it must be reversed. ORS 183.482(8)(d).

This sharp division between procedures for setting standards and procedures for applying them creates widely-recognized difficulties in contemporary administrative law. On the one hand, regulatory standards often rest on scientific, technical, or economic assumptions and probabilities that escape testing in a rulemaking proceeding.[8] On the other hand, the adjudication procedure of a contested case offers neither prior notice nor a familiar form of participation to persons who wish to address the policy premises of a decision apart from the facts of a concrete case.[9] The difficulty of separating the standards of decision from the specific facts is exacerbated when the standards are to govern relatively few, complex, and factually diverse cases. However, we think they can be managed within the energy facility siting act.

The act gives the council wide discretion over many facets of the construction of energy facilities. Like

---

[8] Recent attention has centered on how to assure that federal agencies have an adequate factual predicate for rules that presuppose such a predicate, without "judicializing" the rulemaking process. *See, e.g., Ethyl Corp. v. Environmental Protection Agency,* 541 F2d 1 (DC Cir 1976); Williams, *"Hybrid Rulemaking" under the Administrative Procedure Act: A Legal and Empirical Analysis,* 42 U Chi L Rev 401 (1975) and cases analyzed therein. For a recent decision discussing this problem under the Oregon APA, see *International Council of Shopping Centers v. Oregon Environmental Quality Commission,* 27 Or App 321, 556 P2d 138 (1976).

[9] *NLRB v. Wyman-Gordon Co.,* 394 US 759, 89 S Ct 1426, 22 L Ed 2d 709 (1969); *see* Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act,* 79 Yale L J 571 (1970). The need for flexibility in selecting the statutory procedure appropriate to the issue is discussed in Boyer, *Alternatives to Administrative Trial-Type Hearings for Resolving Complex Scientific, Economic, and Social Issues,* 71 Mich L Rev 111 (1972); Cramton, *A Comment on Trial-Type Hearings in Nuclear Power Plant Siting,* 58 Va L Rev 585 (1972); Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform,* 118 U Pa L Rev 485 (1970).

much agency discretion, it includes judgments of two kinds: judgments about technological feasibility, economic projections, costs, safety, environmental consequences, and similar probabilities that will call for factual information and agency expertise, and judgments about the relative importance of conflicting goals, about values and priorities, in short, policy judgments. With respect to matters on which the statute itself expresses a policy, its directive to the council to adopt standards calls for the factual kind of judgment and procedures appropriate thereto. But where the statute entrusts choices between alternate policies to the agency, its directive to adopt standards calls for agency articulation of these choices, and the procedures for public participation take the place of the legislative forum.

It is these latter, policymaking choices that particularly demand procedures open to the assertion of viewpoints beyond those of the applicant and the agency staff. We may take notice, for purposes of illustration only, that since this case was argued the council has been holding widely-publicized and widely-attended rulemaking hearings on the relationship between nuclear waste disposal and future construction of nuclear power plants. Under the APA, as we have said, this is the normal way to set policy standards in advance of their application in a concrete case. But it is not the only way. It is not indispensable that every standard under ORS 469.470(3) and 469.510 have been adopted in the form of a rule before the initiation of a contested case, as long as it is in fact adopted as a standard, upon notice and procedures that allow for the presentation of views and data on the issues involved, and sufficiently in advance of the final decision so that the applicant and other parties can address the import of the standard for the particular project. One way could be to conduct a rulemaking proceeding on a proposed standard, upon proper notice, along with the contested case. Another way is provided by the provision of the APA that allows an agency to

admit "participants" to intervene in the contested case itself without assuming the full adversary rights and obligations of parties or the evidentiary limitations of witnesses. ORS 183.450(3). While ORS 469.380(2) provides for intervention as a "party complainant or defendant," we do not read this provision to be exclusive of the other forms of participation stated in the APA. We do not prescribe one specific procedure. Where the act does not itself prescribe that standards must be rules (as it does in 469.500), the choice of procedure is left to the council to make, in the first instance through its own rules of procedure, as long as the purposes we have stated are met.[10]

### The council's standards and findings

The council did purport to adopt some standards as rules in advance of its Pebble Springs proceeding. But it phrased these rules mostly as demands for information that an applicant must supply. OAR 345-25-001 to 345-25-049. In 1975, the council issued rules addressed to holders of site certificates. OAR 345-26-005 to 345-26-200. These rules are stated to carry out ORS 469.500 and 469.510. They relate to site certification under ORS 469.470 indirectly insofar as applicants must be prepared to comply with them. The parties are in disagreement about what constitutes a "standard" for purposes of the energy facility siting act and whether such standards as the council adopted have been satisfied. We consider these questions with respect to each of the council's challenged conclusions.

■ 1. *Financial ability.* This is one of the standards for applicants mandated by ORS 469.470. The council's rule on financial ability reads, in part:

"345-25-047 APPLICANT'S FINANCIAL ABILITY. The application shall provide information sufficient to demonstrate the financial qualifications of the applicant to construct and operate the plant. Such information

---

[10]The council's rules provided for intervention as a party, OAR 345-15-020, or appearances by "any person" to state "his position of [sic] the issues" without otherwise participating, OAR 345-15-015.

shall show that the applicant possesses or has reasonable assurance of obtaining the funds necessary to cover estimated construction costs, operating costs for the design lifetime of the plant, including related fuel cycle costs, and the estimated costs of permanently shutting the facility down and maintaining it in a safe condition."

The rule is stated as a demand for information to be included in the application. Respondents also rely on additional such requirements as further "standards" bearing on financial ability.[11] But a demand for information does not tell an applicant, the staff representing the agency, any other party, or the hearing officer what conclusion the information is required to prove. It provides no verbal yardstick against which the evidence is to be measured. A demand for information standing alone is not a "standard."

In the council's quoted rule 345-25-047, however, the demand does not stand alone. The rule requires an applicant to show access to funds necessary to build the proposed plant, to operate it over its useful life, and to shut it down and maintain it in a safe condition. As a "standard," it is minimal and could well be made more informative.[12] But although the reference to

[11]OAR 345-25-045 requires submission of an economic feasibility study. OAR 345-25-047, quoted in the text, continues with a demand for information about the legal and financial relationship between an entity applying for a certificate and its constituent stockholders or owners.

[12]While we find OAR 345-25-047 to contain a standard of financial ability adequate for an initial rule, though barely, a more informative set of standards might, for instance, address these questions: What fraction of initial construction costs the applicant must have available at the time of application; what fraction of the capital to be invested must represent equity rather than borrowing; what firm commitments with respect to either source of funds must be shown before certification; to what extent the project must be able to carry its costs of operation, including eventual shut-down periods, and repay its investment from revenues attributable to it; and the assumptions about the need for power on which financial feasibility may be based. Since ORS 469.470 covers other energy facilities besides power plants, see ORS 469.300(10) a single standard may not necessarily be appropriate for every kind of facility. Of course these are purely illustrative and not meant as a directive of this court. Whether the

these financial requirements leaves a good deal to judgment from one project to another, it does state an initial standard of financial ability that the applicant must meet, as required by ORS 469.470.

■ Petitioner further challenges the absence of a finding that the applicant has the requisite financial ability. If the rule quoted above states a standard "that applicants for site certificates must meet," then an order in a contested case requires a finding of ultimate fact that the applicant has (or has not) demonstrated the financial ability to do everything required by the standard and a "statement of the underlying facts supporting the findings." ORS 183.470. Respondents try to imply such findings from phrases in two findings related to other matters and from a warranty of financial ability included in the site certificate agreement. But none of these can qualify as a finding by the council that its stated standard of financial ability has been satisfied. This is no trivial shortcoming, especially in light of the council's later motion in the Court of Appeals to remand the case on this issue.

■ 2. *Qualifications to construct and operate.* A second standard mandated by ORS 469.470 concerns the applicant's "qualifications as to ability to construct and operate" the project. The council's rule in this respect first informs applicants and others that "[the council] establishes qualifications as to ability to construct and to operate thermal power plants that applicants for site certificates must meet." The remainder of the rule is solely a demand for information

council chooses to refine its standard by rulemaking or otherwise remains in its discretion, as stated in the opinion.

In stating its rule primarily as a checklist of required information with only the broadest kind of standard, the council followed the practice of the federal Nuclear Regulatory Commission. See 10 CFR §50.33(f). But the council has a statutory obligation to "establish standards," unlike the NRC, which is simply authorized to issue licenses "subject to such conditions as the Commission may by rule or regulation establish," 42 USC 2133, and upon "such information as the Commission, by rule or regulation, may determine to be necessary to decide . . . financial qualifications . . ." 42 USC 2232.

concerning the applicant's employees and prior experience which "shall be provided in sufficient detail to establish the applicant's compliance with qualifications established by the Council." OAR 345-25-049. Unlike the rule on financial ability, this rule obviously does not purport to establish a standard of qualifications in itself; it points to a standard allegedly established somewhere else. But there is no further indication where these "qualifications established by the Council" may be found or what they are.

PGE argues that a standard of operating qualifications can be deduced from another council rule, OAR 345-26-015(4), which requires site certificate holders to comply with federal requirements for operating a nuclear facility. From this PGE would apparently infer a council decision to establish ability to comply with the regulations of the federal Nuclear Regulatory Commission as the council's only standard of qualifications under ORS 469.470.[13] The problem with this is not that the council said so in the wrong form, at the wrong time, or by the wrong procedure—it nowhere said so at all.[14] The adoption of a required standard of qualifications, the finding that an applicant meets the standard, and the supporting statement of underlying facts cannot all be telescoped into an inference from the mere inclusion of warranties in the site certificate.

■ 3. *Power needs.* Under ORS 469.510, present and future power needs are one of eight factors that the

_____

[13]PGE defends this as only incorporating the existing federal standards rather than delegating future rulemaking to NRC. *See Seale et al v. McKennon,* 215 Or 562, 336 P2d 340 (1959).

[14]The authority cited for OAR 345-26-015(4) and the rest of chapter 26 of the council's rules is ORS 469.500 and 469.510. The chapter does not purport to carry out the council's duty to establish standards under ORS 469.470. See OAR 345-26-010.

The only references to compliance with federal standards are a statement in the Findings that "PGE represents in its application that the nuclear power plants would be designed, constructed and operated to all NRC standards governing the emission of radioactive effluents," and a Finding of Ultimate Fact that NRC and Environmental Protection Agency rules "have been considered and applied in reviewing PGE's application and imposing site certificate conditions."

council is to "take into account" in adopting standards and rules "for safety, construction and operation of thermal plants."[15] Petitioner challenges both the council's rules and its findings concerning the need for the power from the Pebble Springs project. But the statute does not direct the council to state standards with respect to power needs, by rules or otherwise, though it may do so if it chooses.[16]

■ ■ The council found as an ultimate fact that PGE's customers will need the power from the project by 1984-86. When the council determines that a factual predicate is important to its conclusion on one of the issues entrusted to it, as the council apparently did with respect to power needs, the issue must be identifiable and the finding of ultimate fact supported by underlying facts. It is not clear whether the council equated "need" with "demand." The statement of underlying facts refers to PGE forecasts of demand for its power and certain studies made by its staff and by the Public Utility Commissioner. These procedural recitals are not proper findings of fact by the council itself and do not elucidate the ultimate finding. In the 1975 energy legislation which reorganized the council and created the Department of Energy, the legislature did not equate "need" and "demand." See ORS 469.060,

---

[15] In its Findings and Conclusions, the council misreads these factors as "standards" bearing on "the public health, safety, and environmental policies" mentioned in ORS 469.310.

[16] The council's view of power needs plays different roles for different parts of the statute. Under ORS 469.510, it is one of the eight factors bearing on standards and rules for "safety, construction and operation" of power plants, presumably because those standards should secure against critical interruptions of power supply and provide for alternate sources in case of shutdown. In that context, high need for the power suggests higher standards of uninterrupted operation. More general projections of future power needs play a different role in setting standards for financial ability under ORS 469.470, see supra note 12, and in the council's duty to act consistently with the state's over-all energy policy, ORS 469.010, 469.310, but this is independent of the reference in ORS 469.510. If the council chooses to address its view of power needs for one or more of these purposes outside a specific certification procedure, it may do so by a statement that "implements, interprets or prescribes law or policy," which will be a "rule" under ORS 183.310(7).

469.070. "Demand" is a fact to be estimated or projected, "need" is a conclusion that involves policy judgment. The statute directs all agencies, including the council, to review their policies for consistency with the state's energy policy stated in ORS 469.010 and, after July 1, 1976, to report thereon to an Energy Policy Review Committee. ORS 469.100. Thus it is the council's responsibility to decide whether to treat all demand as "need" under the energy facility siting act as a matter of policy, by one of the means to which we have referred.[17] The findings and conclusions do not show that the council adopted such a policy.

4. *Other findings.* Petitioner contends that many of the commission's "findings" are only recitals of evidence and not proper findings as required by law. The criticism is well taken.[18] This court has repeatedly emphasized the importance of clear findings both of "ultimate facts" and of "underlying facts" as required by ORS 183.470. See *Wright v. Insurance Commissioner,* 252 Or 283, 292, 449 P2d 419, 423 (1969) and cases cited there. This requirement does not rest only on the needs of judicial review. It is addressed in the first instance to responsible decision by the agency. State agencies, unlike federal agencies, are often composed of private citizens who are given crucial governmental responsibilities on a part-time basis, as was done when the 1975 reorganization eliminated the

---

[17]Since January 1, 1977, the council will also have available the annual estimates of "need" by the Department of Energy, ORS 469.060.

[18]Many findings state only that "PGE testified," "the staff believes," or "the staff has concluded . . . ." Other findings state unsupported conclusions. For instance, a "Finding of Ultimate Fact" that a project "will cause no undue impact upon the environment" necessarily represents some factual projection by the council of what the impact will be and a policy judgment about what kind and degree of impact the council considers "undue". The conclusion could mean, for instance, that the project has no environmental impact at all, or that it has an impact which, however, is not judged to be harmful, or that the impact is harmful but judged to be insignificant. None of these is explained in the Findings. If this Finding was meant to relate to standards for construction and operation to be made under ORS 469.510, the council does not say so. If the Finding was thought directly relevant to the "environmental protection policies of this state," ORS 469.310, the council does not identify the policies.

heads of other energy and environmental agencies from the council. It is doubly important that such non-professional agency heads not think of their staff as the agency and themselves as a reviewing body, but rather understand clearly that it is their personal responsibility to determine the facts and to set and apply the standards entrusted to them by the act. Without proper findings by the council, we cannot simply infer this from the recital of evidence, as the Court of Appeals did in this case.

## Conclusion

■ The council acted within its powers in admitting petitioner as a party to its proceeding. Under ORS 183.480, he is entitled to judicial review of the council's final order.

■ The order reflects an erroneous reading of the energy facility siting act in important respects. The council has established only a minimal standard on financial ability and none on ability to construct and operate the proposed facility. Instead it misread the eight statutory factors which ORS 469.510 makes relevant to setting standards under that section as being themselves standards for reaching an ultimate conclusion under ORS 469.470.

■ Because of our disposition of this case, we do not reach other issues raised by the parties. We are persuaded that the energy facility siting act is not *per se* preempted by federal regulation of nuclear power plants, and indeed, PGE here is defending a decision under the act, not attacking it. If and when an applicant claims that a particular denial or condition imposed by the council is preempted will be soon enough to examine that claim. Nor do we anticipate what the council may do about petitioner's additional objections upon further consideration of such standards as it may establish in the light of this decision.

Similarly, we need not consider whether the Court of Appeals should have heeded the council's motion for a remand or whether the council could have initiated

proceedings to reconsider its recommendation to the Governor on its own motion.

We have no wish to impose unnecessary delay on proceedings that are inherently time-consuming. We are equally sensible that decisions on plans for constructing huge and costly physical installations, such as highways, dams, or power plants, create a momentum that is difficult to halt or reverse at later stages in the process. This is not a private lawsuit between petitioner and the applicant. It is a proceeding to review whether an agency has made a decision of great public importance in accordance with the directives of the people's representatives.

Our present remand does not require the council to stop and start over. We have indicated that the statute does not mandate all standards to be established before a site certification is initiated. They may be stated and refined in the course of the proceeding. The council has the choice of procedures suggested in the opinion. After refining its standards, the council can make such revised findings as may be pertinent under its standards and the statute, based upon the existing record and whatever additional evidence those criteria require. With these safeguards, the council's decision on recommending for or against a site certificate will come as close to being well-considered and reasonable as the statutory procedure can bring it.

Reversed and remanded.

**BRYSON, J.,** dissenting.

It is reasonable to conclude that petitioner Marbet's right to challenge, through judicial review, the Energy Facility Siting Council's (Council) final order is limited to the scope of his intervention; that the Court of Appeals usurped the Council's function when it affirmatively appears that petitioner Marbet failed to present such contentions regarding standards to the Council, and the court nevertheless undertook to rule upon the sufficiency of the rules and standards pro-

mulgated by the Council. Christiansen did not petition this court for review of *Marbet v. Portland Gen. Elect.,* 25 Or App 469, 476, 550 P2d 465 (1976).

The result of the majority opinion is that notwithstanding over four years of investigation and study by the Council, still more private and public money must be spent for additional administrative hearings and proceedings before ruling upon Portland General Electric Company's (PGE) request for a power plant site permit on the "Pebble Springs" project. These additional sums of money are eventually paid by the energy consumers in the rate structure and in additional taxes.

The majority concludes that this further expenditure of time and money is mandated by the Council's failure to promulgate standards sufficient to satisfy ORS 469.470[1] and 469.510 (set forth in footnote of majority opinion) and to make adequate findings.

Petitioner Marbet was an intervening party in the proceedings before the Council. The Council properly

---

[1] ORS 469.470: "The council shall:

"(1) Conduct and prepare, independently or in cooperation with others, studies, investigations, research and programs relating to all aspects of site selection.

"(2) After public hearings, designate areas within this state that are suitable or unsuitable for use as sites for the following types of energy facilities:

"(a) Nuclear-fueled and fossil-fueled thermal power plants with nominal electric generating capacity of more than 200,000 kilowatts.
"* * * * *.

"(3) Establish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the energy facility to which the site certificate applies and prescribe the form.
"* * * * *."

At the time litigation was begun before the Court of Appeals, the applicable section was ORS 453.455. This section was renumbered by Oregon Laws 1975, ch 606, which provides for the replacement of the Nuclear and Thermal Energy Council of Oregon by the Energy Facility Siting Council.

placed certain limitations upon petitioner in presenting matters contained in his petition:

"A. Conditions imposed upon Intervenor Marbet—

"(1) Intervenor Marbet may cross-examine and give testimony only on the following subject matters:

"(a) The long-handling and storage of the high level radioactive wastes generated by the proposed plans;

"(b) Possible dangers to the public health, safety and welfare associated with military attacks on nuclear power plants;

"(c) The environmental consequences of radioactive emissions from the plant;

"(d) The propriety of 'banking' sites for the construction of nuclear power plants at some indefinite date in the future.

"* * * * *"[2]

Basically, petitioner, in his appearance before the Council, addressed himself to issues of nuclear safety and nuclear waste disposal technology and made no attempt to concern himself with the administrative standards that the Council had or had not adopted. Petitioner Marbet expressly consented to the limitation placed upon his participation. He derives his standing to seek judicial review from ORS 469.380, which provides:

"(1) Any person may appear personally or by counsel to present testimony in any hearing before the council on any application for a site certificate.

"(2) The council may, by proper order, permit any person to become a party complainant or defendant by intervention who appears to have an interest in the results of the hearing or who represents a public interest in such results. However, the request for intervention must be made before the final taking of evidence in the hearing.

"(3) Any person authorized to intervene in the hearing on a site certificate may appeal the council's recom-

_____

[2]The limitations placed upon petitioner in accordance with his petition to the Council are set forth in full in *Marbet v. Portland Gen. Elect.,* 25 Or App 469, 476, 550 P2d 465 (1976).

[ 473 ]

mendation in the manner prescribed in ORS chapter 183. Such recommendation shall be deemed a final order for purposes of such appeal.
[Formerly 453.375]"

ORS 469.380 does not grant a limited intervenor in a Council's site hearing any right to appeal issues beyond the scope of his petition and intervention before the Council.

ORS 183.480(1) provides:

"(1) Any person adversely affected or aggrieved by an order or any party to an agency proceeding is entitled to judicial review of a final order * * *."

The legislature has chosen to open participation in site licensing procedures to anyone who has an interest in the results of the hearing or who "represents a public interest in such results." However, there is nothing to indicate any intent on the part of the legislature to permit a limited intervenor to judicially challenge the Council's final order on a ground which is neither related to that raised by petitioner's intervention nor made an issue before the Council.

Contrary to the majority's contentions, there is nothing incongruous about the fact that persons "adversely affected or aggrieved" may challenge the Council's final order where that person has neither participated in the contested case nor raised its contentions before the agency while a limited intervenor cannot. Even if the APA did not provide such a right to persons adversely affected or aggrieved, these persons would still have the right to judicially challenge an administrative final order.[3] However, it is apparent

---

[3] "* * * The standing of an aggrieved person need not depend upon a specific legislative grant of standing. Standing grows out of the allegation of a substantial injury directly resulting from the challenged governmental action. See *Pierce v. Society of Sisters*, 268 US 510, 45 S Ct 571, 69 L Ed 1070, 39 ALR 468 (1925). One who alleges that he is or has been adversely and substantially affected by governmental action should have standing to challenge that action if it is judicially reviewable at all. See Davis, Administrative Law * * * 398 [(1959)]." *Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 121, 415 P2d 21 (1966).

from the statutory scheme of the Act and from the judicial interpretations which have given meaning to the words "adversely affected or aggrieved"[4] that the intervention standards are less rigorous than those giving a nonparty the right to contest in court the final order of an administrative agency. If this were not so, then ORS 469.380(3) would be redundant and without purpose.

It is logical to conclude that the legislature, in facilitating input by persons representing particular public interests and viewpoints, did not intend to grant those individuals the right to protest Council actions unrelated to the purpose of their intervention or to the special interest they represent. To hold otherwise would be to grant standing to contest every aspect of the Council's order to individuals not possessing the proximity of interests required to qualify for standing as a person adversely affected or aggrieved and whose only participation before the Council has been on a

---

[4] Although the federal courts have interpreted the federal APA to include as persons adversely affected or aggrieved those individuals urging noneconomic or nonpecuniary interests, this court has not yet gone so far. *See, e.g., Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 121, 415 P2d 21 (1966); *Broughton's Estate v. Central Or. Irr. Dist.,* 165 Or 435, 101 P2d 425, 108 P2d 276 (1940). *Compare United States v. Students Challenging Regulatory Agency Procedures (SCRAP) et al,* 412 US 669, 93 S Ct 2405, 37 L Ed 2d 254 (1973) (5-3 standing issue, Powell, C.J., not participating).

The following is found in 2 Cooper, State Administrative Law 535-36:

"* * * Under some statutes, and under some court decisions, it is required that the appellant must be able to show that particular type of injury which is classified as a legal wrong. However, the present trend, both by statute and by decision, is toward the principle that it is enough to confer standing to appeal if the appellant can establish that he is aggrieved by the order, in the sense that he has suffered substantial and adverse economic effects."

*See also* 2 Cooper, State Administrative Law at 541-42, 554; *Nader v. Altermatt,* 166 Conn 43, 347 A2d 89 (1974) (fundamental test by which status of aggrievement for purposes of qualifying to take an appeal from an administrative order or regulation is determined encompasses determination whether party claiming aggrievement has successfully demonstrated a specific, personal and legal interest in subject matter of decision, as *distinguished from general interest,* such as is the concern of all members of a community as a whole, and whether party claiming aggrievement has successfully established that the specific, personal and legal interest has been specifically and injuriously affected by decision).

discrete issue unrelated to the alleged errors of the Council. It is difficult to see the value in permitting a limited intervenor to argue on appeal issues unrelated to the reasons why he was deemed valuable as an intervenor at the administrative level.

Petitioner Marbet has made no showing of any interest which would qualify him as a person adversely affected or aggrieved. Regardless of any special competency he might possess to serve as a spokesman for the public interest on matters of health and safety, Marbet has no greater personal interest in the Council's final order than does any other resident of Oregon or, for that matter, of the Pacific Northwest.

The majority's argument that his limited participation before the Council makes him a person aggrieved is without basis. By the same rationale, any party to the administrative proceedings should be given the right to appeal issues to the court not raised previously before the administrative agency. This clearly is not the law.

As demonstrated by the above paragraph, this statutory construction issue concerning the scope of the right to appeal granted to limited intervenors is closely related to the policy considerations involved in the doctrine of exhaustion and the procedural rule that, with a few exceptions not relevant here,[5] issues

---

[5]These exceptions pertain to the cases where the subject matter of the appeal goes to the constitutionality of the agency's actions, or to the jurisdiction of the agency to act. *Sunshine Dairy v. Peterson,* 183 Or 305, 193 P2d 543 (1948) is such a case. There the question went to the agency's jurisdiction to act. In *McKart v. United States,* 395 US 185, 89 S Ct 1657, 23 L Ed 2d 194 (1969), the United States Supreme Court added another exception in holding that the taking of an administrative appeal on a question of statutory interpretation is not a prerequisite to a challenge of an order in defending a criminal prosecution. In *Miller v. Schrunk,* 232 Or 383, 375 P2d 823 (1962), we held that errors of law on the part of the administrative agency not going to the original jurisdiction of the agency may not be appealed in the absence of proof of exhaustion. That case involved a plaintiff's right to challenge an administrative agency's acts through writ of review, ORS 34.010 *et seq. See also Vollmer v. Schrunk,* 242 Or 196, 199, 409 P2d 177 (1965) (Denecke, J., specially concurring).

cannot be raised for the first time on appeal.[6]

In *United States v. L. A. Tucker Truck Lines,* 344 US 33, 37, 73 S Ct 67, 97 L Ed 54 (1952), the court noted that:

"* * * Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

Three policy rationales support the rule that parties air their objections first before the agency.

(1) Danger that the proceedings before the agency would be reduced to a preliminary bout, preparatory for the main event, the role of agencies might be reduced to that of takers of evidence.

(2) Presumption that if all arguments are fairly and fully presented before the agency, it will in most cases reach the correct result.

(3) Energies of the reviewing court should not be dissipated in considering points that might never be raised on appeal, if they had been properly presented to the agency.

*See* 2 Cooper, State Administrative Law at 597. *See also* Jaffe, Judicial Control of Administrative Action 452 (1965).

---

[6] *See* 2 Cooper, State Administrative Law 596 (1965); 3 Davis, Administrative Law Treatise 96-97, § 20.06 (1958). *See also, Neeley v. State Compensation Dept.,* 246 Or 522, 426 P2d 460 (1967); *Blackstone Valley Nat. Bank v. Board of Governors of Federal Reserve System,* 537 F2d 1146 (1st Cir 1976); *Beatrice Foods Co. v. F. T. C.,* 540 F2d 303, 313 (7th Cir 1976); *Cisternas-Estay v. Immigration and Naturalization Service,* 531 F2d 155, 160 (3rd Cir 1976) (failure of agency to consider amendment to regulation); *Dobbs v. Train,* 409 F Supp 432 (DC Ga 1975) (objections to standards should be made in the first instance to the administrative agency and courts will not entertain objections not made in agency proceedings); *Mulvey v. Washington Dept. of Social and Health Services,* 15 Wash App 292, 548 P2d 597 (1976); *Scoville v. SAIF,* 22 Or App 62, 537 P2d 1170 (1975).

This requirement that parties raise issues first before the agency has also been described in terms of waiver. *See State ex rel. State Sanitary Authority v. Pacific Meat Co.,* 226 Or 494, 496-97, 360 P2d 634 (1961); *Environmental Protection Agency v. Pollution Control Bd.,* 37 Ill App 3d 519, 346 NE2d 427 (1976).

In the instant case, these policy rationales argue that Marbet's petition be dismissed. As the majority opinion notes, the statutory scheme of the Act does not require all of the rules and standards provided for by ORS 469.470 and 469.510 be formulated prior to the commencement of the site application proceedings. We can only speculate as to the agency's reaction had the insufficiency of their rules and standards been brought to their attention. The presumption in favor of administrative fairness described by Professor Cooper would indicate that this shortcoming might well have been rectified without this court's intervention, had the objection been timely made before the agency. Nor in the instant case should Marbet be allowed to contest the adequacy of the Council's findings. As the Court of Appeals noted in its opinion, *Marbet v. Portland Gen. Elect.,* 25 Or App 469, 475, 550 P2d 465 (1976):

"* * * In addition, the [Council] staff served upon all parties, including petitioners, the proposed findings of fact, order and site certificate and an opportunity was given to the parties to file objections thereto. Petitioners did not avail themselves of the opportunity to object to the proposed findings of fact, order or site certificate."

Having failed to take advantage of this opportunity to protest the proposed findings, it should follow from what has been discussed above that petititioner Marbet should be foreclosed to contest their adequacy before this court.

In his petition for review to this court, petitioner emphasizes, "We are not lawyers in this proceeding but laymen forced to represent our own interests." He argues that it would do the public a great disservice to limit his appeal to the issues on which he intervened and to which he addressed himself before the Council. But there is more than one "public interest" to be preserved here.

The public also has an interest in efficient and

speedy administrative proceedings.[7] They have an interest in insuring that the agencies charged with responsibility for protecting the public interest[8] will be presented with all of the facts and objections to its action before making its decision. In many ways, the name of the game in anti-nuclear power (or the providing of any additional energy for consumption) litigation is delay. The court should not encourage this tactic. Petitioner, as a matter of policy and statutory construction, should be limited on appeal to those issues upon which he intervened before the Council. In the present case the Council was never given an opportunity to consider or change its administrative standards and now the petitioner asks that we reverse and send the matter back to the Council.

It must be admitted that this court is not schooled in the sciences of nuclear and thermal energy. We do know from common experience that learned scientists and engineers are still arguing their respective positions before the people competent to decide what will be the ultimate outcome on nuclear and thermal energy. With this in mind, the courts should exercise

---

[7] Professor Ernest A. Gellhorn offers us a good example of the costs which unwarranted delay can impose upon the public.

"* * * As Mr. Luce noted this morning, public participation in an administrative proceeding may have other costs. The Scenic Hudson power plant license at Storm King was first applied for in 1963, and in 1974 the plant has not been built. On the other hand, my understanding is that the last decision of the Federal Power Commission was to go ahead with the project. There is the obvious cost of delay. There is the additional cost of increased allocations required to build the facility. The original proposal was for 160 million dollars (approximately). The current proposal for the same kilowatt output is for 465 million dollars. Inflation has not been the total difference. And third, of course, there is the equal and more serious problem of the denial of service." Panel II: Standing, Participation and Who Pays?, 26 Ad L Rev 423, 424 (1974).

[8] The policy setting out the responsibility of the Council to the people of this state is provided in ORS 469.310:

"In the interests of the public health and the welfare of the people of this state, it is the declared public policy of this state that the siting, construction and operation of energy facilities shall be accomplished in a manner consistent with protection of the public health and safety and in compliance with the energy policy and air, water, solid waste, land use and other environmental protection policies of this state * * *."

judicial restraint and should not assume responsibilities that belong to others in our constitutional system of government.

The "standards" to be set by the Council will continue to fluctuate in this complex field of science. The courts, by necessity, must give way to the criteria set by the Council which in itself could fluctuate within a relative short span of time as more knowledge is gained in the field of energy production. The legislative scheme seems to have contemplated this very problem and placed an unusual amount of authority in the Council.

The legislature has adopted statutory safeguards to protect the public health and safety. ORS 469.400(7) provides, "* * * If the Governor does not sign the certificate on or before the 30th day after it is submitted to him, the certificate is void." The Director of the Department of Energy has the statutory authority to "curtail" or "halt" plant operation "without hearing or prior notice" whenever there "is cause to believe that there is clear and immediate danger to the public health and safety from continued operation." ORS 469.540, 469.550. These statutes provide most clearly the power of the Council and Director regardless of any "standards" that could possibly be adopted. It is part of the statutory scheme.

The Court of Appeals correctly held in *Marbet* that:

> "It is a well-recognized rule of administrative law 'that a "reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not heretofore presented" ' to the agency, thereby depriving the agency of an opportunity to consider the matter. *Neeley v. Compensation Department,* 246 Or 522, 524-25, 426 P2d 460 (1967); *Stanbery v. Smith,* 233 Or 24, 32-33, 377 P2d 8 (1962); see also 3 Davis, Administrative Law Treatise, § 20.06 (1958); *Easton Utilities Commission v. Atomic Energy Commission, supra,* 424 F2d at 851-52." 25 Or App 469, 477 (1976).

However, the Court of Appeals chose to then ignore

this "well-recognized rule," and to waive Rule 4.15 of the Rules of Procedure of the Supreme Court and Court of Appeals (1974)[9] and rule upon the sufficiency of the standards promulgated by the Council. This the Court of Appeals should not have done. As a matter of statutory construction and policy, petitioner Marbet's petition for review should be dismissed as he is without standing in this court.

The present state of the law on this subject, by whom and on what grounds the Council's orders may be attacked, is an open invitation to future delay and confusion. There is no finality on which the government or its governed may rely with any degree of security. With this in mind, the legislature may desire to reconsider the provisions of ORS 469.380 and 183.480 and related statutes.

---

[9]
"Rule 4.15
    "SCOPE OF REVIEW
    "The petitioner shall be restricted on judicial review to points specified in the petition and shall not urge additional grounds."